FILED
**IN THE UNITED STATES DISTRICT COURT** U.S. DISTRICT COURT
**FOR THE DISTRICT OF MARYLAND** DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JONATHAN F. SCHUPP | : | 2001 AUG 15 ⊃ 3: 02 |
| | : | |
| v. | : | Civil Action WMN-00-2822 |
| | : | AT BALTIMORE |
| JUMP! INFORMATION | : | |
| TECHNOLOGIES, INC. | : | ————————DEPUTY |

**MEMORANDUM**

Before the Court are: Plaintiff's Motion for Partial Summary
Judgment (Paper No. 8) as to Count V; Defendant's Cross-Motion
for Partial Summary Judgment (Paper No. 9) as to Counts II - V;
Plaintiff's Second Motion for Partial Summary Judgment (Wage
Withholding) (Paper No. 13); and Defendant's Cross-Motion for
Partial Summary Judgment (Wage Withholding) (Paper No. 14).  All
motions have been fully briefed and are ripe for decision.  Upon
a review of the pleadings and the applicable law, the Court
determines that no hearing is necessary (Local Rule 105.6) and
that Plaintiff's motions will be denied and Defendant's motions
will be granted.

## I.  BACKGROUND[1]

On July 21, 1999, Defendant Jump! Information Technologies,
Inc. ("Jump!"), a closely held Virginia corporation, offered
Plaintiff Jonathan Schupp employment as Vice-President, Sales.
As part of the compensation package, Plaintiff obtained options

---

[1]The parties, while disputing many of the particulars of the
events at issue, do not dispute the overarching chain of events.

1

in 78,000 shares of Jump! Series A, Class B non-voting stock at a purchase price of 25 cents per share.[2]  Plaintiff's options were subject to a vesting schedule which provided that 50% of the options vested in year one and 25% in each of the following two years.  See Jump! Stock Option Agreement at ¶ 3.  Pursuant to the vesting schedule, Plaintiff exercised his option to purchase 39,000 shares of Jump! stock in September 1999.  In its offer of employment to Plaintiff, Jump! agreed to waive the $9,750 option price "provided that the Peterson's business development opportunity is closed under Jump!'s contract by June 30, 1999."  Jump! Offer Letter Dated June 21, 1999.

Meanwhile, in August 1999, Jump! officers Allan Von Dette and William Engle entered into discussions with Logical Design Solutions, Inc. ("LDS"), a closely held Delaware corporation, regarding LDS' proposed acquisition of Jump!.  Jump! employees, including Plaintiff, learned of the proposed acquisition at an informational meeting, which was held in October 1999 by Mimi Brooks, LDS' Chief Executive Officer ("CEO"), and Bruce Lovenberg, LDS' Chief Financial Officer ("CFO").  Among the items discussed at that meeting was the fact that LDS was exploring the

---

[2]At the time of Plaintiff's employment, Jump! had 2,100,000 issued and outstanding shares of its Series A, Class A voting stock.  These shares were equally divided between Jump!'s founders and officers William Engle (Jump!'s President and Chief Executive Officer), Allan Von Dette (Jump!'s Chief Financial Officer), and Jeffrey Beardsley (Jump!'s Chief Technology Officer).

2

possibility of an initial public offering ("IPO") of its stock by the end of 2000. See Lovenberg Aff. at ¶ 4-5; Engle Aff. at ¶ 8; Von Dette Aff. at ¶ 8.

In early November 1999,[3] Von Dette and Engle met with Plaintiff to discuss Plaintiff's options in regards to his Jump! stock and unvested options. At this meeting, Plaintiff received a "Buy Out" sheet which showed that Jump! was willing to buy back Plaintiff's stock at a price of 39 cents per share for a total of $15,210. In addition, if Plaintiff was willing to waive his rights in his existing options, the Jump! options would convert to options for 4,286 shares of LDS stock,[4] subject to a vesting schedule. Plaintiff was also offered employment with LDS, at his existing salary and commission rate, as an Account Executive ("AE") servicing the Washington, D.C. area.

On November 10, 1999, Plaintiff accepted the terms of the "Buy Out" and executed a Stock Purchase Agreement, under which Plaintiff sold his 39,000 shares to Jump! for $15,210 in cash. Plaintiff also executed a Termination of Stock Options Agreement, under which he exchanged his remaining Jump! options for options

---

[3]The parties dispute the exact date.

[4]For this calculation the parties used a LDS share price of $2.28. Plaintiff now alleges that LDS undervalued the price of its shares. The Court notes that in regards to the option exchange, this alleged undervaluation worked to Plaintiff's advantage. Had the exchange been calculated using the higher price of $2.60, Plaintiff would have received options in only 3,750 shares of LDS.

3

in LDS.  Simultaneously, Von Dette and Engle purchased
Beardsley's 700,000 Jump! shares for $175,000, or 25 cents per
share, and then sold 100% of Jump!'s equity to LDS in exchange
for $525,000 in cash and 109,500 shares of LDS stock, which was
valued at a price of $2.60 per share.[5]  In addition, Von Dette
and Engle each received a two year employment contract as a
Regional Manager in the Washington DC market, positions of
significantly less stature than their Jump! positions of CFO and
President/CEO, respectively.

Plaintiff voluntarily terminated his employment with LDS in
January 2000.  Subsequently, on August 15, 2000, Plaintiff filed
suit against Jump! in the Circuit Court for Washington County,
Maryland, alleging the following causes of action: breach of
contract for failure to pay bonuses and commissions (Count I);
misrepresentation (Count II); constructive trust (Count III);
unjust enrichment (Count IV); and breach of fiduciary duty (Count
V).  On September 20, 2000, LDS, as successor-in-interest of
Jump!, filed a notice of removal on the basis of diversity of
citizenship.  On January 2, 2001, Plaintiff filed a motion for
partial summary judgment as to Count V, breach of fiduciary duty.

---

The stock issued to Von Dette and Engle had several
conditions attached.  First, the stock was not freely
transferable; of the 54,750 shares received by each Engle and Von
Dette, 34,091 were held in escrow.  In addition, LDS retained the
option to repurchase, for all or a percentage of the stock's fair
market value, all shares if either man left LDS' employment.  See
Shareholders Agreement Between Von Dette, Engle and LDS at ¶ 4.

4

LDS responded by filing a cross-motion for summary judgment on Counts II thru V. On March 15, 2001, Plaintiff filed a second motion for partial summary judgment as to Count I. LDS again responded with its cross-motion for partial summary judgment as to Count I.

## II. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to summary judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For purposes of summary judgment, a dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if, when applied to the substantive law, it affects the outcome of litigation. Id.

A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant demonstrates there is no genuine issue of material fact and that he is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand

5

the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact remains. Celotex, 477 U.S. at 324. Unsupported speculation is insufficient to defeat a motion for summary judgment. Felty, 818 F.2d at 1128 (citing Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986)). Additionally, the existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. Instead, the evidentiary materials must show facts from which the finder of fact could reasonably find for the non-moving party. Anderson, 477 U.S. at 252. At the summary judgment phase, it is not appropriate for the court to make credibility determinations, weigh the evidence, or draw inferences from the facts which are adverse to the nonmoving party; these are jury functions. Id.

## III. DISCUSSION

### A. Count I - Wage Withholding Claims

Upon Plaintiff's resignation, he was sent a letter by Kevin Casey, LDS' Vice President, Human Resources, dated January 21, 2000, in which it was represented that Plaintiff was due $6,250 in unpaid commissions. The letter also stated that $4,500 of that amount, which was paid to Plaintiff as a retention bonus upon his joining LDS and was contingent upon Plaintiff remaining in LDS' employ until May 1, 2000, was being retained by LDS as Plaintiff failed to meet the length of employment requirement.

6

See Casey Letter Dated June 21, 2000. The remaining $1,750 believed to be due Plaintiff was paid to Plaintiff in September 2000.

After his resignation, Plaintiff alleges that he learned that the $9,750 option price, which had been waived, was "secretly deducted" from his earned commissions. Plaintiff also claims that, pursuant to an email sent on December 6, 1999, by Casey,[6] Plaintiff is owed a total of $9,000 in referral bonuses. According to Plaintiff, LDS' failure to pay the monies due him is a violation of the Maryland Wage Payment and Collection Law, Lab. & Employ. § 3-501, et seq. ("Wage Law").[7]

LDS refutes that it owes Plaintiff any money. According to LDS, Casey, in his January 21, 2000 letter, erroneously indicated

---

[6] The Casey email offered LDS employees a $3,000 bonus for each candidate referred to one of two LDS job fairs and who were extended offers of employment within 48 hours of the job fair. See Casey Email Dated Dec. 6, 1999.

[7] Plaintiff asserts that the Maryland Wage Law is applicable to him because he was permitted to work out of his home, located in Maryland, once a week. Plaintiff makes this assertion in spite of the fact that Jump! was a Virginia corporation, LDS is a Delaware corporation, Plaintiff's office was in Virginia, and Plaintiff was hired under a contract subject to Virginia law. As the Court finds that there are no monies owing to Plaintiff, it need not reach the applicability of the Maryland Wage Law. However, were the Court to do so, it would find that Plaintiff's argument is without merit and stretches the law too far. To give credence to Plaintiff's reading of the law would subject employers who have a traveling workforce to a myriad of wage laws and provide no set rules under which that company must operate. Here, the mere fact that Plaintiff may have performed work in Maryland does not transform Jump!, or LDS, into a company that employs workers in Maryland.

7

that Plaintiff was due $6,250 in unpaid commissions when, in fact, Plaintiff was due only $5,788.38, of which $1,816.10 had been paid to Plaintiff prior to his resignation. See Exh. A to Lovenberg Aff. Defendant further contends that, after accounting for the $4,500 retention bonus, Plaintiff has actually been overpaid in the amount of $527.72.[8]

The Court begins its analysis with Plaintiff's commissionable sales. Plaintiff has presented no evidence to refute that his total sales were $125,517.51. Nor has Plaintiff disputed that he was paid, prior to the date of his resignation, $1,816.10 of the commissions due him. It is also uncontroverted that Plaintiff's June 29, 1999 offer letter indicated that the $9,750 price to exercise the year one options would be waived. See Jump! Offer Letter Dated June 21, 1999. LDS asserts that in consideration for this waiver, Plaintiff orally agreed that he would not receive a commission on his first $9,750 in sales. See Engle Aff. at ¶ 3, 5. The record reflects no tangible evidence of this alleged agreement.[9] Thus, the Court finds that Plaintiff was due commissions on the entire $125,517.51. This amount, at

---

[8] This does not include the $1,750 paid to Plaintiff in September 2000.

[9] In fact, the record reveals that the consideration for this waiver was Plaintiff's consummation of a sale to "Peterson" prior to June 30, 1999. See Jump! Offer Letter Dated June 21, 1999.

Plaintiff's 5% commission rate, is $6,275.88.[10]

As to the $4,500 retention bonus, Plaintiff alleges that he was not required to repay that amount. Plaintiff further argues that, even if repayment was required, LDS' action of deducting that amount from the commissions due Plaintiff was in violation of the Maryland Wage Law, which requires that the employee authorize any deductions in writing. See Wage Law, § 3-503. Assuming, arguendo, that the Maryland Wage Law were to apply to Plaintiff, and the Court believes it does not, Plaintiff did provide LDS with written authorization to collect these funds should Plaintiff fail to remain in LDS' employ through May 1, 2001. See LDS Nov. 10, 1999 Offer Letter (stating that if Plaintiff chooses to leave LDS' employment before May 1, 2000, he will be required to refund the full retention bonus amount to LDS at the time his employment ends). Plaintiff indicated his acceptance of this condition by signing the offer letter. Moreover, it defies common sense to require, as Plaintiff would have it, that LDS pay Plaintiff all monies due him and then institute a lawsuit or some other collection action to recoup the retention bonus.[11]

---

[10] Plaintiff erroneously asserts that the $9,750 was deducted from commissions due him. The record, however, indicates that there was no such deduction and, instead, Plaintiff simply was not paid commissions on this amount.

[11] A waste of judicial resources would result if every employer who was due money by a terminated or resigning employee

9

This leaves the matter of the alleged $9,000 in referral bonuses due Plaintiff. The parties agree that on December 6, 1999, Casey sent an email which reads, in pertinent part, as follows:

> Next week, LDS will sponsor two special internal job fairs, one in NYC and one in New Jersey, designed to "Build the Team with Friends and Family." This is a great opportunity to introduce your qualified non-LDS colleagues and family members to one of the hottest -- tadah!! -- companies around while providing yourself a little extra Holiday jingle! . . .
>
> . . .
>
> -- If LDS hires your referral, you will receive a $3,000 bonus.
>
> . . .
>
> . . . We will extend offers or declinations within 48 hours of the two fairs. . . .
>
> . . .
>
> Stay tuned for more details. . . .

Casey Email Dated Dec. 6, 1999. Plaintiff contends that this email entitles him to a $3,000 referral bonus for the referral of each of three individuals: Larry Salesky, Tianshu Lu, and Brian Cassidy. While all three individuals were hired by LDS, the evidence indicates that Plaintiff is not entitled to a referral bonus as to any of these individuals. Salesky and Lu were both hired by LDS before the email was sent on December 6, 1999. See

could not simply deduct the amount due it from any monies due the employee.

10

Casey Aff. at ¶ 6, 7 (stating that Salesky was hired on November 23, 1999, and Lu on December 1, 1999).[12]  Cassidy, who attended the December 13, 1999 job fair at the invitation of Plaintiff, was not hired until March 6, 2000, more than three months after Plaintiff tendered his resignation and well past the 48 hour offer limit specified in Casey's email.[13]  See Casey Aff. at ¶ 10, 11; Casey Email Dated Dec. 6, 1999.

Based on the foregoing, the Court calculates that Plaintiff has been overpaid in the amount of $1,790.22.[14]  Having found that no funds were improperly withheld from Plaintiff,

_____

[12]In 1999, LDS did have a referral program in effect.  Under this program, a $1,000 bonus was paid for referrals resulting in hire if the person hired satisfactorily completed six months of employment and one of several other conditions did not apply. Among these other conditions were the requirements that: (1) all referrals be for persons outside the employment of LDS; (2) a referral form be completed; and (3) the referring employee must be employed with LDS at the end of new hires six month probationary period.  See Exh. B to Casey Aff.  In this case, both Salesky and Lu were independent contractors with LDS at the time they were hired; Plaintiff did not complete a referral form for either person; and Plaintiff was not employed with LDS when the probationary period of either gentlemen ended.

[13]Plaintiff is not entitled to any referral bonus as to Cassidy under LDS' 2000 referral program as that program provides for three incremental $1,000 payments "at three, six and nine months from the candidate's date of hire providing both the candidate and the referring employee are still staff at LDS." Exh. C. to Casey Aff. (emphasis added).  Plaintiff was not employed by LDS at the time Casey was hired, much less three, six and nine months later.

[14]$6,275.88 in commissions due Plaintiff less $1,816.10 previously paid less $4,500 recoupment of the retention bonus less $1,750 paid in September 2000.

11

Plaintiff's motion for partial summary judgment as to Count I will be denied and Defendant's cross-motion will be granted.[15]

## B. Count V - Breach of Fiduciary Duty

The essence of Plaintiff's breach of fiduciary duty claim is that, as officers, directors, and majority shareholders, Von Dette and Engle owed a fiduciary duty to Plaintiff as a minority shareholder. Von Dette and Engle breached this duty by failing to disclose material facts and/or by affirmatively misrepresenting other facts. Plaintiff claims that, but for the breach, he would have received compensation "substantially in excess" of the $15,210 actually received. LDS disagrees. According to LDS, Plaintiff's claim fails because, under Virginia law, there is no fiduciary duty owed to a specific shareholder. Were such a duty owed to Plaintiff, he has waived his right to make such a claim by virtue of the release contained in paragraph 6 of the Stock Purchase Agreement, which was signed by Plaintiff on November 10, 1999. Moreover, even if the release is deemed invalid and a fiduciary duty is found, there is no breach because Plaintiff cannot show that all material facts were not disclosed and/or that Von Dette or Engle benefitted at Plaintiff's expense.

Assuming, arguendo, that a fiduciary duty is owed to a

---

[15]LDS has not asserted any claim as to the amount overpaid to Plaintiff.

12

minority shareholder,[16] the Court finds that Plaintiff cannot
succeed as to this claim because: (1) he cannot establish that
material facts were either not disclosed or were misrepresented
to him; and, (2) even if they were, Plaintiff cannot establish
that he suffered a financial loss as a result.[17]

---

[16]The Supreme Court of Virginia has not directly addressed
this issue. It is, however, "well settled that '[a] Virginia
corporation's directors and officers owe a duty of loyalty both
to the corporation and to the corporation's shareholders.'"
Byelick v. Vivadelli, 79 F.Supp.2d 610, 623 (E.D. Va. 1999)
(quoting WLR Foods v. Tyson Foods, Inc., 869 F.Supp. 419, 421
(W.D. Va. 1994)). Moreover, "a director of a private corporation
cannot directly or indirectly, in any transaction in which he is
under a duty to guard the interests of the corporation, acquire
any personal advantage, or make any profit for himself, and if he
does so, he may be compelled to account therefor to the
corporation." Id. (quoting Rowland v. Kable, 174 Va. 343, 366
(1940)(internal quotation marks omitted)). This duty has been
extended to the conduct of the officers or directors of a
corporation in their dealings with the corporation's
stockholders. Id. (citing Adelman v. Conotti Corp., 215 Va. 782,
790 (1975)). The United States District Court for the Eastern
District of Virginia, in Byelick, further extended this duty to
individual shareholders. Id. at 625 (concluding that, "if faced
with the question whether a minority shareholder of a closely
held corporation has a cognizable claim against an inside
director for breach of fiduciary duty in respect of a corporate
transaction which benefits the inside director, the Supreme Court
of Virginia would hold in the affirmative, particularly where, as
here, there is only one minority shareholder").

[17]The release does not, as LDS asserts, bar this claim. The
validity of the release turns on the validity of the agreement as
a whole. If Plaintiff was improperly induced to sign the Stock
Purchase Agreement, then the entire agreement, including the
release, is voidable. See Bank of Montreal v. Signet, 193 F.3d
818, 828 (4th Cir. 1999) ("A false representation of a material
fact, constituting an inducement to the contract, on which the
purchaser has a right to rely, is always ground for recission of
the contract."). See also George Robberecht Seafood, Inc. v.
Maitland Brothers Co., Inc., 220 Va. 109, 111-12 (1979).

According to Plaintiff, the following material facts were either not disclosed or misrepresented: (1) the amount of compensation that was to be paid to Von Dette and Engle for the sale of Jump!; (2) that the sale of Jump! to LDS was contingent on Von Dette and Engle delivering 100% of Jump! equity; (3) the timing of LDS' proposed IPO; and, (4) the representation that Plaintiffs remaining Jump! options had not vested.

There is no dispute that Von Dette and Engle received $525,000 in cash and 109,5000 shares of LDS stock in exchange for their 2,100,000 shares of Jump!. Using Plaintiff's valuation of LDS stock of $2.60 per share as of November 10, 1999,[18] Von Dette and Engle received the equivalent of 38.557 cents for each share of Jump! stock. Plaintiff received a price of 39 cents per share for his Jump! stock, a price in excess of the 38.557 cents received by Von Dette and Engle, as well as the share price of 25 cents paid to Beardsley for his 700,000 shares.[19] As Plaintiff received more for his shares than any other party, he cannot substantiate his claim that Von Dette and Engle, or Jump!,

_____

[18]Plaintiff belatedly asserts that the $2.60 price is an undervaluation and that LDS' filing with the Securities and Exchange Commission ("SEC") revealed that LDS valued its shares at more than six times that figure. Plaintiff did not, however, provide any evidence to support this assertion. In addition, the SEC filing occurred on March 3, 2000, nearly four months after the $2.60 valuation was made.

[19]Notably, the shares owned by Von Dette, Engle, and Beardsley were all voting shares, while the shares owned by Plaintiff were not.

14

profited at his expense, or that the price he received was not both fair and reasonable.

In a related argument, Plaintiff claims that Von Dette and Engle's failure to disclose the terms of their LDS employment contracts was a material omission. Plaintiff's claim is deficient in two respects. First, the actual contracts have not been provided by Plaintiff. Second, Plaintiff has not given any explanation as to why these contracts, which are for the personal services of Von Dette and Engle, have any bearing on the fairness of the price paid to Plaintiff for his Jump! stock. These are separate and distinct transactions. In addition, it defies common sense to believe that Plaintiff, a Jump! salesperson, would receive the same terms in a new employment contract with LDS as would Von Dette and Engle, the former CFO and President/CEO of Jump!.

Next Plaintiff asserts that Von Dette and Engle did not disclose that LDS' purchase of Jump! was contingent on LDS acquiring 100% of Jump!'s equity. The record, however, shows that the Stock Purchase Agreement signed by Plaintiff indicates that the sale of Plaintiff's stock to Jump! and the purchase of Jump! by LDS were inter-related transactions and that the failure of one would lead to the failure of the other. See Stock Purchase Agreement at ¶ 4 (stating that the purchase of Plaintiff's stock will "take place simultaneously" with the sale

15

of all Jump! stock to LDS and that this "Agreement and the transaction contemplated hereby are expressly contingent upon the closing of the sale of [Jump!]"). In addition, even if this information had been disclosed, Plaintiff could not, as he asserts, have "demanded" a higher price for his shares. At most, as a dissenting shareholder, Plaintiff would have had the right to have his shares redeemed by Jump! for their "intrinsic worth." See U.S. Inspect, Inc. v. McGreevy, 2000 WL 33232337, *1 (Va. Cir. Ct. Nov. 27, 2000). The intrinsic worth is "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless the exclusion would be inequitable." Id. (quoting Va. Code Ann. § 13.1-729) (internal quotation marks omitted). This right is designed to "assure the dissenting stockholder that he will be fully compensated for the value of which he has been deprived by the [corporate action] and no more." Id. at *4 (quoting Adams v. United States Distributing Corp., 184 Va 134, 146 (1945)) (internal quotation marks omitted) (emphasis added). Plaintiff has provided no evidence which would support a conclusion that the 39 cents per share he received was not fair or reasonable, or that it did not reflect the "intrinsic worth" of Jump! immediately before its acquisition by LDS. If anything, in light of the price paid to Beardsley, the record demonstrates that

16

Plaintiff received a price in excess of the "intrinsic worth" of his shares.

Plaintiff further asserts that Von Dette and Engle misrepresented the timing of LDS' proposed IPO.  The evidence, however, contradicts this assertion.  Von Dette, Engle and Lovenberg all attest that the timing of the IPO was initially disclosed to Plaintiff by Brooks and Lovenberg at a meeting held on October 8, 1999, at which the proposed acquisition was revealed to Jump! employees.  See Lovenberg Aff. at ¶ 4; Engle Aff. at ¶ 9; Von Dette Aff. at ¶ 9.  Lovenberg further asserts that the decision to move-up the timing of the IPO was not made until early 2000, see Lovenberg Aff. at ¶ 16, several months after the completion of the transactions at issue.  Plaintiff has presented no evidence to refute these contentions, nor has he provided any evidence to demonstrate that Von Dette and Engle possessed any information prior to November 10, 1999, that the IPO might take place earlier than the fourth quarter of 2000.  Plaintiff's assertions and conjecture are insufficient to defeat a motion for summary judgment.

Lastly, Plaintiff contends that Von Dette and Engle misrepresented that his remaining options had not vested.  Pursuant to the terms of Plaintiff's original Option Agreement, his unvested options vest immediately if

> (A) the Corporation [Jump!] should (i) merge or be
> consolidated with another corporation or entity

17

>           under circumstances where the Corporation is not
>           the surviving corporation or entity, (ii) sell
>           all or substantially all of its assets, (iii)
>           liquidate or dissolve, or (iv) should a
>           controlling interest in the stock of the
>           Corporation (50% plus one) be acquired by any
>           person or entity not a shareholder of the
>           Corporation as of May 1, 1998;
>
>      and
>
>           (B) as a result of an event described in
>           sub-section (A) above, the Participant shall
>           fail to receive a bona fide offer of employment
>           with power and authority analogous to the
>           Participant's title and/or office prior to the
>           merger consolidation, sale, transfer, or
>           acquisition. . . .

Jump! Stock Option Agreement.  According to Plaintiff, this

"golden parachute" became effective because the position offered

to him with LDS was not a bona fide offer of employment with

power and authority analogous to his position at Jump!.

Plaintiff asserts that, at Jump!, he was considered a part of the

management team with the authority to hire and fire within the

sales division, that he reported directly to the President/CEO,

and that he helped define Jump!'s sales planning and strategy.

In contrast, at LDS, he was one of ten account executives, he was

not part of the management team, he had no authority to make

personnel decisions, and he did not report to the President/CEO.

     LDS contends, and the Court agrees, that LDS did extend a

bona fide offer of employment and that the positions are

analogous.  Any differences in Plaintiff's day-to-day functions

and responsibilities are due to the size difference of the two

companies; LDS had 125 more employees than Jump!. Affidavits of
Von Dette and Engle state that Plaintiff did not have the
authority to hire or fire any Jump! employee. Plaintiff has
provided no evidence that he ever actually hired or fired anyone.
Jump!'s offer letter to Plaintiff supports Von Dette and Engle's
position in that it shows that Plaintiff was offered a position
on the professional staff, not as part of the management team.
See Jump! Offer Letter Dated June 21, 1999. In fact, Plaintiff
was only given the title of "Vice President, Sales" after he
requested the title and stated that the title was necessary to
appease clients who only "want to talk about spending $500K on a
web project with a sales guy that has VP on his card."
Plaintiff's Email to Engle Dated June 14, 1999, RE: Jump!
Employment Offer. Moreover, in that same email, Plaintiff refers
to the position offered him as only a "business development
opportunity." Id. The fact that Plaintiff reported directly to
Engle, Jump!'s President/CEO, is due to the small size of Jump!
and not to any elevated level of "power and authority" assigned
to Plaintiff. In sum, Plaintiff has provided no evidence to
support a finding that, as a Jump! employee, he was anything
other than a salesperson. This is the same type of position,
with the same salary and commission schedule, he was offered at

LDS.[20]

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motions for summary judgment will be denied and Defendant's cross-motions will be granted.[21] A separate order will issue.

William M. Nickerson
United States District Judge

Dated: August *15*, 2001

---

[20]In addition, Plaintiff cannot show that his reliance on Von Dette and Engle's representations regarding Plaintiff's new AE position was reasonable or justified. A reasonable person, who was about to join a new company and voluntarily terminate a known right, would, at the very least, undertake an investigation in regard to the new position. Had Plaintiff done this and found that the AE position, in his opinion, was not analogous to his position at Jump!, he could have refused to waive his option rights. Because Plaintiff did not make even the most cursory investigation, he may not now claim that he was induced or misled into terminating his right to the unvested options. This is particularly true where Plaintiff has provided no evidence as to the content of these alleged misrepresentations.

[21]Having found that Plaintiff is entitled to no recovery, that no material omissions or misrepresentations were made, and that Plaintiff was not "damaged," Plaintiff's claims as to Counts II thru IV must also fail. Accordingly, Defendant's motion as to these counts will also be granted.